UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

BURGER KING EUROPE GMBH,    )
    )
       Plaintiff,    )
    )    CIVIL ACTION NO.
VS.    )
    )    3:14-CV-1417-G
CHRISTIAN GROENKE,    )
    )
       Defendant.    )

## MEMORANDUM OF DECISION

## I. INTRODUCTION

This action was brought by the plaintiff, Burger King Europe GmbH ("BKE"), against the defendant, Christian Groenke ("Groenke"), to recover on a guaranty agreement. Following a bench trial on June 22-24, 2015, the court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

### A. Parties

1.    Plaintiff, BKE, is a Swiss entity with its principal place of business in Zug, Switzerland. Joint Pretrial Order at 25 (docket entry 99). BKE operates and franchises restaurants throughout Europe. [Trial Tr. vol. 1 128 (docket entry 136)].

2.     Burger King Corporation ("BKC") is based in Miami, Florida and has an ownership interest in BKE.  [Trial Tr. vol. 1 188:7-13].  BKC created BKE, and transferred to BKE the responsibility to sign the franchise agreements with franchisees in Europe, the Middle East, and Africa.  [Trial Tr. vol. 1 176:15-177:1, 128:17-24].

3.     Burger King Beteiligungs GmbH ("BKB") is a German company based in Munich, Germany.  [Trial Tr. vol. 1 185:17-22, 187:13-14].  BKE is not the parent of BKB and owns no interest in BKB.  [Trial Tr. vol. 1 187:8-12].  BKB is an affiliate of BKE to whom BKE has delegated day-to-day management functions over the German market.  [Trial Tr. vol. 1 13:23-14:6, 187:8-9].

4.     Global Business Services ("GBS") is a division of BKC.  [Trial Tr. vol. 1 220:19-21].  GBS creates the franchise fee invoices and then sends them to BKB by email.  [Trial Tr. vol. 2 48:1-12, 49:5-11 (docket entry 137)].

5.     Defendant, Groenke, is a resident of Dallas, Texas and is a United States citizen.  [Trial Tr. vol. 3 5:10-22 (docket entry 138)].  In 1997, Groenke formed HEGO System-Gastronomie GmbH & Co. KG ("HEGO").  [Trial Tr. vol. 3 8:8-16].  From 1997 to 2010, HEGO operated approximately eighteen Burger King® franchises in and around Berlin.  [Trial Tr. vol. 3 8:23-9:19].  Groenke has an ownership interest in various entities, some of which operate Burger King® restaurants in Germany.  [Trial Tr. vol. 3 26].

B.  Witnesses

6.      At trial, BKE presented the testimony of its retained expert, Stephanie

Bschorr ("Bschorr"), a German lawyer specializing in the areas of commercial law, tax,

and insolvency.  [Trial Tr. vol. 1 58:11-59:18, Pl. Trial Ex. 34].  Bschorr testified

regarding relevant German legal issues in the case, including the applicability and

requirements of German Civil Code sections 313, 765, and 767, and the accessories

rule.  [Trial Tr. vol. 1 58:10-125:18]; BÜRGERLICHES GESETZBUCH [BGB] [CIVIL

CODE] §§ 313, 765, 767.

7.      BKE presented the testimony of Andreas Bork ("Bork"), the managing

director of BKB and Vice President and General Manager for the Central Division of

BKE, who testified regarding the relevant franchise agreements and the general

business practices of BKE and BKB in Germany.  [Trial Tr. vol. 1 126:16-246:20].

Bork started working for BKB on August 18, 2010.  [Trial Tr. vol. 1 128:6-8].

8.      Lastly, BKE presented the testimony of Erick Azen ("Azen"), BKB's

finance director who manages the net restaurant growth for BKE.  Azen testified to

Burger King's® accounting procedures and how the relevant royalty and advertising

fees were calculated and processed.  [Trial Tr. vol. 2 6:6-84:16].

9.      Groenke presented the testimony of his German law expert, Dr.

Christoph Schulte-Kaubrugger ("Schulte"), who testified to the accessories rule and

the role of an insolvency administrator in a German insolvency proceeding.  [Trial Tr. vol. 2 94:14-136:13].

10.    Groenke presented the testimony of Ahmed Asmar ("Asmar"), who is the managing director for HEGO, which still operates Burger King® franchised restaurants in Germany.  [Trial Tr. vol. 2 137:17-25, 138:11-13, 139:19-21].  Asmar is a former managing director of HEGO's sister company Burger King GmbH Berlin ("BK Berlin"), the company associated with the franchises that were placed into insolvency.  [Trial Tr. vol. 2 150:21-151:17].  Asmar testified to the financial reporting procedures of a Burger King® franchisee and franchisee business operations. [Trial Tr. vol. 2 137:16-191:23].

11.    Lastly, Groenke testified regarding the execution of the guaranty agreement, further negotiations with Burger King®, the alleged relatedness between other negotiations and the guaranty agreement, and events surrounding the insolvency proceedings.  [Trial Tr. vol. 3 5:9-99:24].

C.  Summary of the Claims

12.    On April 17, 2014, BKE sued Groenke asserting breach of a guaranty agreement dated June 9, 2010 (the "guaranty"), signed by Groenke.  *See* Complaint (docket entry 1).  The guaranty provides that Groenke guarantees the performance and obligations, including payment, of franchised Burger King® restaurants in Europe, twenty (20) of which are at issue in this lawsuit.  [Pl. Trial Ex. 21].  BKE

asserted that Groenke was in breach of the personal guaranty that he executed in June of 2010 that guaranteed the "fulfillment of all obligations of the respective franchisee arising from the franchise contracts." *Id.* The complaint included a chart that listed the Burger King® store number, the name of the franchisee, the restaurant address and an amount each allegedly owed. Complaint ¶ 18.

13.   Groenke signed the guaranty in connection with his company SAVE Vermogensver Waltungs GmbH, Holding KG ("SAVE")'s June 2010 acquisition of 15 restaurants in Berlin, Germany. [Pl. Trial Ex. 21]. SAVE purchased the restaurants pursuant to a purchase transfer agreement by which it purchased the stock of the franchise operating companies for the restaurants. [Def. Trial Ex. 29; Pl. Trial Ex. 24 (English excerpts)]. As part of the transaction, another company owned by Groenke, HEGO, received a development agreement to develop as many as 38 restaurants in a geographic area surrounding Berlin. [Def. Trial Ex. 31; Pl. Trial Ex. 28 (English translation)].

14.   Groenke was an indirect owner of the operating companies for the relevant restaurants at the time that the obligations to BKE accrued. [Trial Tr. vol. 3 26]. Operation of the restaurants was pursuant to the franchise agreements by which each of the operating companies agreed to pay BKE a royalty of 5% of monthly gross sales for the use of the Burger King® system and the Burger King® marks, and to pay BKE through BKB, an amount equal to 5% of monthly gross sales to be used for

advertising, sales promotion and public relations.  [Pl. Trial Exs. 1-20, Pl. Trial Ex. 5 (English translation of franchise agreements at 16-23), Trial Tr. vol. 1 130].

15.    Additionally, BKE seeks to recover, according to the terms of the franchise agreements, payment of a $10,000 transfer fee on the sale or transfer of any restaurant.  [Pl. Trial Ex. 5 (English translation of franchise agreements at 16-23); Pl. Trial Exs. 1-20; Trial Tr. vol. 2 76-78].  Groenke sold at least one restaurant to Mr. Mura, which triggered the franchise fee.  [Trial Tr. vol. 1 147:8-148:2, Trial Tr. vol. 3 84:1-9].  The franchise fee of €6.731,25 that BKE is seeking in the invoice BKE 1767 is dated December 4, 2012 and states it is due on December 20, 2012.  [Pl. Trial Ex. 35].  BKB entered into an agreement with the insolvency administrator effective December 3, 2012 that waived BKE's right to seek any franchise fees from the insolvent franchisees from that date forward.  [Def. Trial Ex. 5].  Groenke argued the invoice dated December 4th falls under this waiver and thereby cannot be sought because this agreement constituted a waiver extinguishing the principal obligation.  Groenke's Proposed Findings of Fact ¶ 74 (docket entry 141).  The court concludes that the agreement with the insolvency administrator applies to debts incurred in or after December 2012 and thus does not waive BKE's rights to the fees Groenke incurred before December 2012.  [Def. Trial Ex. 5, Trial Tr. vol. 1 147:8-148:2].  The transfer fee is listed on a December 2012 invoice, but it is a debt that accrued in November 2012.  [Pl. Trial Ex. 35, Trial Tr. vol. 1 147:8-148:2].  Therefore, BKB's

agreement with the insolvency director did not waive BKE's right to collect the transfer fee.

16.   BKE seeks to recover royalties and advertising contributions unpaid for each of the restaurants below in the amounts indicated below, inclusive of a transfer fee of €6.731,25 (then equivalent to $10,000) due as a result of the transfer of BK#16811.

| BK# | Address | Amounts Due Pursuant to Guaranty |
|---|---|---|
| 08734 | Berlin, Landsberger Allee, Allee Center | EUR 18.869,14 |
| 13927 | Berlin, Alt-Mahlsdorf | EUR 25.510,82 |
| 15470 | Berlin, Straße des 17. Juni | EUR 39.125,16 |
| 14562 | Berlin, Teltower Damm | EUR 7.801,48 |
| 15971 | Berlin, Landsberger Allee 277 | EUR 29.420,04 |
| 15455 | Potsdam, Rudolf-Moos-Straße | EUR 42.758,80 |
| 16499 | Berlin, Tempelhofer Damm | EUR 30.935,98 |
| 09570 | Berlin, Johannisthaler Chaussee 1.2 | EUR 16.247,60 |
| 16811 | Berlin, Saatwinkler Damm | EUR 31.422,71 |
| 17215 | Berlin, Großbeerenstraße | EUR 17.414,50 |
| 17619 | Teltow, Mahlower Straße | EUR 16.008,94 |
| 14264 | Berlin, Buckower Damm | EUR 22.300,80 |
| 14190 | Berlin, Nahmitzer Damm | EUR 20.725,60 |
| 14471 | Berlin, Ostpreußendamm | EUR 19.141,80 |
| 14798 | Berlin, Charlottenburger Chaussee | EUR 29.110,52 |
| 08141 | Neubrandenburg, Juri- Gagarin-Ring | EUR 14.525,98 |
| 08592 | Schwedt/Oder, Werner- Seelenbinder-Straße | EUR 7.375,78 |
| 10039 | Wildau, Chausseestraße | EUR 22.057,66 |
| 03297 | Berlin, Schlossstraße | EUR 39.849,38 |
| 08590 | Brandenburg/Wust, An der Bundesstraße | EUR 27.614,68 |

D. Groenke's Defenses

17.     Groenke's answer pleads the following affirmative defenses:  (1) that BKE's claims are barred by a failure of consideration in that Groenke did not receive reasonably equivalent value for his guaranty; (2) that the claims are barred in whole or in part by BKE's misrepresentations; (3) that the claims are barred in whole or in part by BKE's own contributory negligence; (4) that BKE's claims are barred in whole or in part because the royalty payments that BKE claims are subject of an insolvency proceeding in Germany and any recovery from Groenke is barred pending distribution from such proceeding; and (5) that the claims are barred in whole or in part by a right of setoff.  Groenke's Answer (docket entry 12) at 4.  Also, Groenke later argued that (6) BKE could not recover because BKE had written off the underlying debt on its internal accounting books [Declaration of Dr. Schulte attached in support of Defendant's Response to Plaintiff's Motion for Summary Judgment (docket entry 77)], and (7) BKE could not recover because the guaranty was not a valid contract due to a frustration of purpose defense under BGB § 313.  Joint Pretrial Order at 23-24, 30-31.  These defenses are not pled in Groenke's answer, and Groenke has not sought to amend his answer to conform to the evidence.  *See* Answer.  The court will address the additional affirmative defenses, but it ultimately concludes that all such defenses are unsupported by the evidence.

E. <u>The Guaranty Agreement</u>

18.     In June 2010, one of Groenke's companies, SAVE, acquired 15 additional franchises that were owned by BK Berlin.  [Trial Tr. vol. 1 194:25-195:13; Trial Tr. vol. 2 150:1-14, 163:17-24, 152:8-18; Trial Tr. vol. 3 17:18-22].  The BK Berlin stores were losing money heavily, and the losses were significant.  [Trial Tr. vol. 2 163:25-164:19, Trial Tr. vol. 3 18:4-6, 18:24-19:1].  As part of the transaction, HEGO received a Development Agreement to develop as many as 38 restaurants in a geographic area surrounding Berlin.  [Def. Trial Ex. 31; Pl. Trial Ex. 28 (English translation)].

19.     Groenke testified that he was promised a regional development agreement for the greater Berlin area under which he could acquire an additional 91 stores that Burger King® was still operating in Germany, and he would be given a larger development agreement for a greater portion of Germany.  [Trial Tr. vol. 3 19:18-20:8, 35:23-36:6].  He testified that BKE's agreement to provide the additional 91 stores and the larger development agreement was necessary consideration for Groenke's agreement to execute the guaranty because the BK Berlin stores' losses would absorb all the profits of the HEGO performing stores.  [Trial Tr. vol. 3 80:6-81:3].  Groenke testified that he agreed to purchase the nonperforming 15 stores because he was "given promises" that "induced [him] to sign the guaranty in the first place."  [Trial Tr. vol. 3 19:13-17].  Groenke testified that these promises were made

by Heinz-Peter Dickes, the head of development for Burger King® in Germany,

Austria and Switzerland, and Jonathan Fitzpatrick of BKE.  [Trial Tr. vol. 3 20:10-

23].  He also testified that the promises were made to him in multiple meetings

before the BK Berlin transaction closed and before he executed the guaranty.  [Trial

Tr. vol. 3 20:19-23, 53:20-54:25].

20.    However, the court concludes that Groenke has failed to show that the

alleged promises were part of the guaranty agreement.  Groenke testified that the

"general outline of the deal" had been discussed before the BK Berlin transaction

closed.  [Trial Tr. vol. 3 54:1-25].  Yet, over two years later, he wrote a letter to BKE

representatives seeking to continue negotiations on the potential transaction for the

91 restaurants.  [Pl. Trial Ex. 31; Trial Tr. vol. 3 90:2-93:11].  It is clear that the deal

was far from definite enough to be considered a legally binding agreement in June

2010, let alone in August 2012.  The alleged verbal promises were not consideration

for the guaranty agreement.

### F.  The Royalty and Advertising Fees

21.    The royalty and advertising fees paid by the franchisees are determined

by the franchisee's sales.  [Trial Tr. vol. 2 156:19-25].  The franchisees calculate the

amount of their own sales and then send that information to GBS.  [Trial Tr. vol. 2

48:21-25, 142:14-16].  The operation of the restaurants was pursuant to franchise

agreements by which each of the operating companies agreed to pay BKE a royalty of

5% of monthly gross sales for the use of the Burger King® system and the Burger King® marks, and to pay BKE through BKB, an amount equal to 5% of monthly gross sales to be used for advertising, sales promotion and public relations.  [Pl. Trial Exs. 1-20; Trial Tr. vol. 1 130].

22.     HEGO and BK Berlin reported their sales the same way.  [Trial Tr. vol. 2 156:19-158:4].  The franchisee has until the second day of the month to report the sales for the prior month.  [Trial Tr. vol. 1 132:13-18; Trial Tr. vol. 2 16:1-5].  If a franchisee does not report sales data by the second day of the month, GBS estimates the sales data with a form calculation.  [Trial Tr. vol. 2 16:9-15].

23.     A franchisee receives two separate invoices, one from BKE for the royalty fee and one from BKB for the advertising fee.  [Trial Tr. vol. 1 136:22-24, Def. Trial Exs. 6-25; Trial Tr. vol.  2 147:3-11].  The royalty fees were invoiced by and payable to BKE.  [Trial Tr. vol. 1 138:1-139:16; Def. Trial Exs. 6-25].  The advertising fees were invoiced by and payable to BKB, who paid for and ran the German advertising fund.  [Trial Tr. vol. 1 140:24-141:3, 232:24-233:25; Def. Trial Exs. 6-25].

24.     Groenke argues that BKE is not the proper party to recover the advertising contributions because the invoices are in the name of BKB.  *See* Groenke's Proposed Findings of Fact ¶¶ 75-77.  However, the evidence is to the contrary.  The advertising invoices all contain a legend that the money is due in the name of and on

behalf of BKE.  [*E.g.*, Def. Trial Ex. 6, at CG000409; Trial Tr. vol. 1 141].  The

franchise agreements all make clear that the money is due to BKE, and that BKB

claims no interest in the sums sought.  [Pl. Trial Exs. 1-20, Trial Tr. vol. 1 141].

25.     BKE's witnesses testified that their method of invoicing franchisees is

reliable and has been regularly utilized with respect to approximately 700 restaurants

in Germany for many years.  [Trial Tr. vol. 1 133:15-135:17; Trial Tr. vol. 1 134-35].

26.     The Groenke owned franchises subject to the guaranty failed to make

the required payments from August 2012 through December 2012 before insolvency

proceedings commenced.[1]  [Trial Tr. vol. 1 22:21-23:4].  The fees the franchises

failed to pay, that Groenke guaranteed he would pay if the franchises did not, have

still not been paid to BKE.  [Trial Tr. vol. 3 98].  At trial, Groenke testified "I am not

suggesting that I do not owe anything," but stated he was unsure of the amount

owed.  [Trial Tr. vol. 3 98].  Groenke presented no evidence disputing BKE's

calculations.  [Trial Tr. vol. 3 97:13-21].  Additionally, he presented no evidence that

BKE's methods of invoicing franchisees have ever been unreliable.  BKB's director of

finance and supply chain, who is responsible for managing finance issues in Germany,

testified that he reconciled the amounts sought by BKE against invoices Groenke

acknowledged having received and confirmed that the amounts due were identical

---

[1]     The Groenke-owned franchise, BK #8592, filed for insolvency sometime
after April 2013.  [Trial Tr. vol. 2 32-33].  BKE seeks to recover royalties and
advertising contributions from that restaurant for amounts due as of April 1, 2013.
[Pl. Trial Ex. 25].

and accurate.  [Trial Tr. vol. 2 8:1-10:25, 40:15-21].  The court concludes that the testimony of BKE's witnesses is credible and their method of calculating the amounts due is reliable based upon BKE's established practices.

### G.  Alleged Additional Promises

27.    Groenke signed the guaranty in connection with SAVE's acquisition of 15 Burger King® restaurants in Berlin and HEGO's written development agreement to develop as many as 38 additional Burger King® restaurants in the Berlin area. [Def. Trial Exs. 29, 31; Pl. Trial Ex. 24].  In addition, Groenke testified that BKE representatives made verbal promises during the transaction that he would receive the right to purchase an additional 91 restaurants owned by BKE and to enter a second development agreement for as many as 300 restaurants throughout Germany.  [Trial Tr. vol. 3 19-20].  Groenke contends that BKE did not fulfill these promises and that BKE therefore cannot enforce the guaranty.  *See* Groenke's Proposed Findings of Fact ¶¶ 78-84.  The evidence does not support these allegations.

28.    First, Groenke acknowledged that none of the terms material to either of these purported agreements (91 restaurants or the 300 restaurant development plan) was agreed to prior to his signing of the guaranty.  [Trial Tr. vol. 3 35:15-36:6, 91:4-11, 92:10-18].  As Groenke admitted, and as is evident by email correspondence and a term sheet all exchanged over a year after the guaranty was signed, the parties had not agreed on an exact price, the amount of any development fees, the number of

restaurants that could be developed, the geographic territory subject to development, or other material terms.  [Trial Tr. vol. 3 54-66; Def. Trial Exs. 36, 37 41; Pl. Trial Ex. 32].  Instead, all of these terms were still being negotiated in the fall of 2011, more than a year after the guaranty was signed.  [Trial Tr. vol. 3 54-66; Def. Trial Exs. 36, 37, 41; Pl. Trial Ex. 32].  Groenke argued that the parties had agreed that the price of the 91 restaurants would be calculated by using a multiplier based on EBITDA (earnings before interest, taxes, depreciation and amortization).  [Trial Tr. vol. 3 20:24-21:12, 52:10-22, 75:11-76:6].  The court does not find credible that Groenke (a sophisticated businessman represented by counsel) would sign the guaranty based solely on the alleged, indefinite, oral promises of such possible future transactions.  [Trial Tr. vol. 3 6:8-9:19, 54:16-25].

29.    The purported promises are also contrary to the integration clause in the agreements entered at the same time as the guaranty.  The agreements affirmed that there were no other agreements between the parties (other than those mentioned) and stated only that any additional development rights would be no less than any other franchisee.  [Def. Trial Ex. 29 at § 4.3.3 ("no other agreements have been entered into"); Pl. Trial Ex. 28 at § 9 ("any changes . . . shall be required to be in written form to take effect"); Pl. Trial Ex. 28 at § 1 (5) ("this agreement shall have no effect on the Developer's option to, like any other potential Franchisee, submit an

application requesting the approval to develop Burger King Restaurants outside of the development territory . . .")].

30.     Additionally, had there been definitive enforceable promises, Groenke relieved BKE of any such commitments when he signed a term sheet outlining the parties' deal points in October 2011.  [Pl. Trial Ex. 32].  The term sheet expressly provides that the parties were not bound to enter any transaction, stating that "any party shall have the right to terminate the negotiation of the potential transaction . . . for any reason or no reason," that "no party owes the other parties any duty to negotiate a formal agreement," that there is no "obligation to negotiate in good faith," and that there would be no enforceable agreements until execution of final definitive agreements.  [Pl. Trial Ex. 32].

31.     Moreover, contrary to his present assertions, Groenke characterized the promises quite differently in a letter to BKE more than two years after the guaranty was signed.  In a letter written by Groenke in August 2012, he stated only that he had an "understanding" that he would be the "front runner for any further re-franchising" should his operation of the Berlin restaurants "run smoothly."  [Pl. Trial Ex. 31].  In the August 2012 letter, Groenke acknowledged that the parties had even broken off discussions regarding the potential joint venture and purchase of the 91 restaurants.  *Id.* ("[W]e continue to stand by our offer to reenter the negotiations and finalize the definitive agreements for the BK91 joint venture.").

32.     Therefore, the court concludes that the execution of the guaranty did not depend upon the oral promises now alleged by Groenke, or alternatively, that Groneke relieved BKE of any responsibility for those promises by the time he signed the October 2011 Term Sheet.  [Pl. Trial Ex. 32].

## H.   Insolvency Proceeding

33.     It is undisputed that Groenke's franchise companies, HEGO and SAVE, operated the restaurants during the August-December 2012 time period for which recovery is sought.  [Trial Tr. vol. 3 26; Trial Tr. vol. 3 94:9-95:20].

34.     The insolvency proceeding for 19 of the 20 restaurants at issue in this case officially opened on December 3, 2012.[2]  [Trial Tr. vol. 1 203:16; Def. Trial Ex. 64].  When an official insolvency proceeding opens, the insolvency administrator has to operate the companies or close them down [Trial Tr. vol. 1 203:21-24], but he cannot incur any losses.  [Trial Tr. vol. 1 212:19-23].  After December 3, 2012, the restaurants at issue were operated by an insolvency administrator.  [Trial Tr. vol. 3 69].  Because of the prohibition against incurring losses, BKB and the insolvency administrator entered into an agreement where BKB waived its right to franchise fees that the franchises would incur beginning in December 2012.  [Def. Trial Ex. 5].

---

[2]     The exception is BK #8592.  That restaurant filed for insolvency sometime after April 2013.  [Trial Tr. vol. 2 32-33].  BKE seeks to recover royalties and advertising contributions for that restaurant only for amounts due as of April 1, 2013.  [Pl. Trial Ex. 25].

BKE does not seek to recover any amounts for operations of these restaurants incurred during or after December 2012.  [Trial Tr. vol. 1 147:23-148:2].

35.    At the time Groenke's companies filed their insolvency proceedings, BKE assigned the Groenke debts to a write-off account on its internal books.  [Trial Tr. vol. 1 160-61].  German law expert, Bschorr, testified that German legal and accounting principles required this action because the insolvencies rendered collection of the obligations risky or doubtful.  [Trial Tr. vol. 1 80-82].  Andreas Bork testified that the amounts were assigned to a write-off account to comply with German accounting requirements.  [Trial Tr. vol. 1 160-62].

36.    An insolvency administrator requires every party to timely file their claims -- with proof -- against the insolvent companies.  [Trial Tr. vol. 1 76:11-23].  During the course of the insolvency proceeding, BKE and BKB each filed a claim for "franchising fees" in the insolvency proceeding.  [Def. Trial Ex. 1A].  In February 2013, BKB filed claim number 20 in the insolvency proceeding for €105.367,00.  [Trial Tr. vol. 1 78:6-23; Def. Trial Ex. 1A].  On the same day, BKE filed claim number 21 for €112.098,25.  [Trial Tr. vol. 1 78:22-23, 80:19-23].

37.    BKE sent Groenke demand letters on July 8, 2013 and August 1, 2013 for payment of the amounts due.  [Pl. Trial Exs. 22, 23; Trial Tr. vol. 1 156].  Groenke contends that he did not see the demand letters until after this suit was filed [Trial Tr. vol. 3 10:15-17, 88:11], but acknowledges that the addresses are to his

address on the guaranty [Pl. Trial Ex. 21] and to his email address.  [Trial Tr. vol. 3

10-11].  Although the guaranty does not require that BKE make demand prior to suit,

the court concludes that BKE sent notices demanding payment on the dates

indicated.

## I.  Evidence and Amount of Damages

38.    Based on the foregoing, the greater weight of the evidence supports that

the franchisees have failed to pay the above amounts to BKE which were due

pursuant to their franchise agreements.  [Trial Tr. vol. 3 98].  Likewise, Groenke has

failed to pay to BKE the amount of franchise fees which have accrued.  [Trial Tr. vol.

3 98].  The total amount due and owing to BKE is €478.217,37.  At the relevant

currency exchange rate, as discussed *infra*, the amount equates to $629,800.77.  This

court can take judicial notice of the exchange rate between the euro and the dollar.

*Ruiz v. Federal Government of Mexican Republic*, No. 07-CV-079, 2007 WL 2978332, at

*2 n.13 (W.D. Tex. Sept. 28, 2007), *appeal dism'd*, 286 Fed. App'x. 843 (5th Cir.

2008).

## III.  CONCLUSIONS OF LAW

1.    Both parties agree that the guaranty was entered into by BKE and

Groenke under BGB §§ 765 and 767.  [Pl. Trial Ex. 21].  Accordingly, German law

applies to the guaranty agreement.  *See* BGB §§ 765, 767.  The principles of German

law have been acknowledged by both parties' German law experts.  [Trial Tr. vol. 1

70; Trial Tr. vol. 2 133-34].

2.     The German Civil Code is contained in the BGB.  [Trial Tr. vol. 1

120:19-21].  Courts regularly rely on interpretations or commentaries like the

Palandt.  [Trial Tr. vol. 1 67:12-69:15, 119:14-25; Def. Trial Ex. 66]; *Palandt-Sprau*,

COMMENTARY ON THE GERMAN CIVIL CODE (74 ed. 2015).  The Palandt covers all

German court rulings every year.  [Trial Tr. vol. 1 68:23-69:4].  Both of the German

law experts relied upon the Palandt in formulating their opinions.  [Pl. Trial Ex. 34;

Def. Trial Ex. 64].

A. <u>Groenke Breached the Guaranty</u>

3.     Groenke breached the guaranty by failing to pay BKE the royalties and

other fees due.  *See* BGB § 767; [Pl. Trial Ex. 34].  BKE has shown the existence of

the underlying franchise agreements; the terms of the guaranty agreement; the

occurrence of the conditions upon which liability is based; and Groenke's failure or

refusal to make payment under the franchise agreements and guaranty.

4.     The guaranty states that it was entered pursuant to BGB §§ 765 and

767.  [Pl. Trial Ex. 21].  BKE's German law expert, Bschorr, testified that the

guaranty meets the requirements to be enforceable under German law, and her

written report also makes evident that conclusion.  [Trial Tr. vol. 1 70; Pl. Trial Ex.

34].  Groenke's German legal expert, Dr. Schulte, concurred.  [Trial Tr. vol. 2

133:12-134:7].  The terms of the guaranty are clear and unambiguous in requiring

that Groenke guarantee the prompt payment and performance of all obligations

under the franchise agreements during the time period in question.  [Pl. Trial Ex. 21].

5.      BKE is not required to first seek payment against the principal obligors

before seeking recovery on the guaranty.  [Trial Tr. vol. 1 70:1-71:24; Pl. Trial Ex.

34].  BKE's enforcement of the guaranty in accordance with its plain terms is

consistent with German and Texas law.  BGB §§ 765, 767; [Trial Tr. vol. 1 70:1-

71:24; Trial Tr. vol. 2 133:12-134:22]; *Barrand, Inc. v. Whataburger, Inc.*, 214 S.W. 3d

122, 129 (Tex. App.--Corpus Christi 2006, pet. denied).

B.  <u>Sufficiency of Evidence of Franchise Agreements and Damages</u>

6.      In order for BKE to be able to recover from Groenke, it must first

establish that there were valid and enforceable franchise agreements in effect with the

insolvent franchisees that would make the franchisees liable for the principal

obligation.  *See* BGB § 767, ¶ 1; [Def. Trial Ex. 64].  BKE met its burden of proof by

offering the relevant franchise agreements.  [Pl. Trial Exs. 1-20].

7.      In addition, Groenke's obligations under the guaranty are tied to the

"obligations of the respective franchisee arising from the franchise contracts."  [Pl.

Trial Ex. 21].  BKE met its burden of proof by offering the guaranty agreement,

sufficient evidence of the invoices and data supporting its calculations, and proof that

neither the franchisees nor Groenke had paid the fees at issue.  [Pl. Trial Exs. 1-20,

- 20 -

25, 33, 35; Trial Tr. vol. 3 98]; see *United States v. Hutson*, 821 F.2d 1015, 1019-20

(5th Cir. 1987); *United States v. Moore*, 923 F.2d 910, 915 (1st Cir. 1991); *United*

*States v. Catabran*, 836 F.2d 453, 457 (9th Cir. 1988).

C.   Conflict of Law and Burden of Proof on Affirmative Defenses

8.       Groenke bears the burden of proof on his affirmative defenses.  *Sunburst*

*Media Management, Inc. v. Devine*, No. 3:08-CV-1170-G, 2010 WL 1962499, at *5

(N.D. Tex. May 17, 2010) (Fish, J.).  Although the guaranty was entered pursuant to

German law, Texas law applies to matters of remedy and procedure.  See *Morris v.*

*LTV Corporation*, 725 F.2d 1024, 1027 (5th Cir. 1984).  Likewise, Texas law applies

in areas where a party has failed to conclusively establish the applicable foreign law,

or its differences from the law of the forum.  *Matter of Reznick*, 370 Fed. App'x 552,

553-54 (5th Cir. 2010) (citing *Banco de Credito Industrial, S.A. v. Tesoreria General*, 990

F.2d 827, 836 (5th Cir. 1993) ("When the parties have failed to conclusively

establish foreign law, a court is entitled to look to its own forum's law in order to fill

in any gaps.")); *Enigma Holdings, Inc. v. Gemplus International S.A.*, No. 3:05-CV-1168-

B, 2006 WL 2859369, at *8 (N.D. Tex. Oct. 6, 2006) (Boyle, J.) (noting that the

parties seeking to apply foreign law have the burden of proving its substance to a

reasonable certainty); *Pavlick v. Advance Stores Co.*, No. 2:10-CV-67147, 2013 WL

1100679, at *1 n.1 (E.D. Pa. Feb. 21, 2013) ("Under Rule 44.1, it is incumbent

upon the parties to "carry both the burden of raising the issue that foreign law may

apply in an action, and the burden of adequately proving foreign law to enable the court to apply it in a particular case.").

### D.  Statute of Frauds

9.     The court does not reach the statute of frauds issue (*i.e.*, whether the contract could have been performed within one year) because it concludes that the alleged oral promises were speculative at the time the guaranty was entered into in June 2010.  Groenke failed to establish that the alleged oral promises were considered part of the June 2010 guaranty agreement because the terms were never finalized [Trial Tr. vol. 3 60:11-15, 66:13-15], Groenke entered into a term sheet as a proposed plan in 2011 [Pl. Trial Ex. 32], and Groenke tried to keep negotiating the terms of the alleged oral agreement in August 2012 [Def. Trial Ex. 47].  See *supra*, Findings of Fact, Section G, ¶¶ 27-32.

### E.  Groenke's Failure of Consideration Affirmative Defense Fails

10.     Groenke's first affirmative defense (failure of consideration) fails based on the evidence and law.  In exchange for the guaranty, Groenke's company, SAVE, entered the purchase transfer agreement and received ownership of 15 Burger King® restaurants.  [Pl. Trial Ex. 21].  Additionally, his company, HEGO, entered the regional development agreement and received the right to develop as many as 38 additional restaurants.  *Id.*  The 15 restaurants and the Berlin regional development plan are sufficient consideration to support Groenke's guaranty.  [Trial Tr. vol. 1 88];

see also *Garcia v. Lumacorp, Inc.*, No. 3:02-CV-2426-L, 2004 WL 1686635, at *11

(N.D. Tex. July 27, 2004) (Lindsay, J.) (failure of consideration claim failed as a

matter of law where facts were not such that there was a failure of consideration but

rather a question of adequacy of consideration), *aff'd*, 429 F.3d 549 (5th Cir.2005).

F. <u>Groenke's Misrepresentation, Set-off, and Contributory</u>
<u>Negligence Affirmative Defenses Fail</u>

11.     Groenke's second (misrepresentations), third (contributory negligence)

and fifth (setoff) affirmative defenses allege that Groenke is entitled to a setoff or that

the guaranty is invalid due to BKE's purported wrongdoing.  However, the guaranty

bars any defense of setoff or invalidity.  [Pl. Trial Ex. 21 ("I hereby waive any defense

of invalidity and set-off pursuant to § 770 of the BGB, unless the counterclaim to

offset is recognized or legally established.")].  BKE's German law expert, Bschorr,

testified that this language constitutes a waiver of any right of setoff against the debts

due under the guaranty.  [Trial Tr. vol. 1 73-74].  These principles are consistent with

Texas law which provides that as a contract, the guaranty is to be enforced in

accordance with its plain language.  *Whataburger, Inc.*, 214 S.W.3d at 129.  A

guarantor has no right to assert setoffs as defenses where setoff is waived by the

guaranty.  *LaSalle Bank National Association. v. Sleutel*, 289 F.3d 837, 840-42 (5th Cir.

2002).  Therefore, Groenke's setoff, misrepresentations and contributory negligence

affirmative defenses fail because they are attempts to setoff in contravention of the

guaranty.  Further, Groenke neither pled nor proved any facts to support his misrepresentations and contributory negligence affirmative defenses.

### G.  Groenke's Insolvency Proceeding Affirmative Defense Fails

12.     Groenke's fourth affirmative defense asserts that BKE's claims are barred because the payments BKE claims here are the subject of insolvency proceedings in Germany and, under German law, any recovery from Groenke is barred pending distribution from such proceeding.  Answer at 4.  The court is persuaded by the contrary testimony of Bschorr that neither the financial collapse of Groenke's franchise companies, nor their filing of insolvency proceedings, impacts BKE's ability to proceed directly against Groenke based upon the independent security provided by his guaranty.  [Trial Tr. vol. 1 75-77].  Indeed, this principle is consistent with United States bankruptcy law.  *See* 11 U.S.C. §524(e).  Whether or not the insolvency administrator allowed, acknowledged, or disallowed BKE's and BKB's claims in the Germany insolvency proceeding does not affect BKE's right and ability to enforce the guaranty here.  [Trial Tr. vol. 1 75:6-81:3].

### H.  Groenke's Write-off Affirmative Defense Fails

13.     Groenke's sixth affirmative defense (write-off) fails because writing off or depreciating a debt in one's internal records does not constitute a waiver of the principal obligation.  *See* HANDELSGESETZBUCH [HGB] [COMMERCIAL CODE], § 253; [Pl. Trial Ex. 34 ¶ 5; Trial Tr. vol. 1 81:4-19].  Andreas Bork testified that BKE was

not forgiving the debt by its accounting entry [Trial Tr. vol. 1 162], and German law expert Bschorr testified that BKE did not extinguish the debt by this action.  [Trial Tr. vol. 1 77, 81-83 (testifying that under German law the right to collect on a guaranty is waived only by payment, or by a written agreement of a knowing waiver of the debt by the creditor)].  Neither payment nor knowing waiver occurred here. [Trial Tr. vol. 1 83:14-25; Trial Tr. vol. 3 98].  The court finds that BKE did not waive its right to recover the debt by virtue of these accounting practices.

### I.  Groenke's Frustration of Purpose Affirmative Defense Fails

14.    Groenke belatedly attempted to assert that the guaranty is unenforceable pursuant to BGB § 313, his seventh affirmative defense (frustration of purpose).  The court notes that this issue was first raised one week before the pretrial conference but was not pled as an affirmative defense.  *See* Answer at 4.  Groenke waited until after the close of discovery -- and the eve of trial -- to raise this defense. At trial, the court expressed its concern with Groenke's inexplicable delay in raising this issue, and made clear that the court would take this delay into account in deciding whether to consider this defense and what weight to give it.  [Trial Tr. vol. 3 107].  No fact or circumstance in this case -- such as recently discovered evidence -- justifies the delay.  The court finds this notice to be unreasonable.  See *Thyssen Steel Company v. M/V Kevo Yerakas*, 911 F. Supp. 263, 266 (S.D. Tex. 1996) (purpose of Rule 44.1 is to prevent unfair surprise during discovery or at trial); see also *Northrop*

*Grumman Ship Systems, Inc. v. Ministry of Defense of the Republic of Venezuela*, 575 F.3d 491, 496-97 (5th Cir. 2009) (noting that Rule 44.1 is intended to "avoid unfair surprise" and one of the factors to be considered in determining whether the notice was reasonable include the stage which the case had reached at the time of the notice) (internal citations omitted).

15.     Nonetheless, the court considers the defense, and concludes that the defense fails.  Groenke alleges that he would not have signed the guaranty but for BKE's alleged promise to sell him 91 additional restaurants and enter into the 300 store development agreement for most of Germany.  [Trial Tr. vol. 3 19-20]. However, the court does not find Groenke's testimony credible that his execution of the guaranty depended upon such vague and uncertain verbal promises.  See *supra* ¶¶ 18-20, 28-32.  Moreover, Groenke relieved BKE from any responsibility for such promises upon entering the October 2011 Term Sheet expressly stating that BKE had no obligation to enter such transactions with him.  [Pl. Trial Ex. 32].  Lastly, BGB § 313 is an exception to German law principles honoring the sanctity of contracts. [Trial Tr. vol. 1 121].  Its provisions have rare applications, limited to situations where underlying assumptions between the parties become invalid or unlawful.  [Pl. Trial Ex. 34].  This case involves no such circumstances because the alleged verbal promises, which relate to Groenke's stated "purpose" of this transaction (the 91 restaurants and the greater Germany development plan), were not definite enough or

agreed upon at the time of the guaranty agreement, nor even in August 2012. [Trial Tr. vol. 3 60:11-15, 66:13-15, Def. Trial Ex. 47, Pl. Trial Ex. 32]. Therefore, the frustration of purpose defense fails because the alleged "purpose" was not frustrated for any reason other than that the parties were still negotiating this frustrated "purpose" years after the guaranty was signed.

16.    Nor does the court find credible Groenke's testimony regarding enforceable verbal promises in light of the integration clauses contained in the purchase and transfer agreement [Def. Trial Ex. 29] and regional development agreement [Pl. Trial Ex. 28] executed contemporaneously with the guaranty. See *supra*, Findings of Fact, Section G, ¶ 29; see also *U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399, 403 (5th Cir. 2000) (holding that an integration clause is evidence that the written agreement is the entire agreement).

## J.  BKE is Entitled to Judgment

17.    BKE has proven that Groenke breached his obligations under the guaranty. Further, the court concludes that Groenke has failed to meet his burden of proof on any of his affirmative defenses. Thus, the court concludes that BKE is entitled to judgment against Groenke for breach of the guaranty.

## K.  The Amount of the Judgment

18.    The evidence at trial establishes that Groenke owes BKE €478.217,37 for amounts past due under the guaranty. This amount must be converted to dollars.

In a diversity action, the proper date for the conversion of foreign currency debt or contract damages is a question of state law. *Elite Entertainment, Inc. v. Khela Brothers Entertainment Inc.*, 396 F. Supp. 2d 680, 694 (E.D. Va. 2005) (citing *Competex, S.A. v. Labow*, 783 F.2d 333, 334 (2d Cir. 1986)).

19.     In the absence of pertinent state law precedent, federal courts sitting in diversity look to federal precedent for guidance. *Siematic Mobelwerke GmbH & Co. KG v. Siematic Corporation*, 669 F. Supp. 2d 538, 542 (E.D. Pa. 2009) (citing *ReliaStar Life Insurance Co. v. IOA Re, Inc.*, 303 F.3d 874, 883 (8th Cir. 2002)); *Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291, 323 (6th Cir.), *cert. dism'd*, __ U.S. __, 132 S.Ct. 572 (2011). Here, however, Texas law is clear on this issue. In *El Universal, Compania Periodistica Nacional, S.A. de C.V. v. Phoenician Imports, Inc.*, the Texas court of appeals stated that due to fluctuation inherent in currency, Texas courts are given the discretion to convert foreign judgments based on the rate of exchange applicable on either the date of judgment or date of the breach. 802 S.W.2d 799, 803 (Tex. Civ. App.--Corpus Christi 1990, writ denied); *Butler v. Merchant*, 27 S.W. 193 (Tex. Civ. App. 1894, no writ); RESTATEMENT 3RD, RESTATEMENT OF FOREIGN RELATIONS LAW OF UNITED STATES, § 823(2) (1986).

20.     Under the approach utilized in *Phoenician Imports*, if the foreign currency has depreciated in value since the time of breach, then the date of the breach sets the applicable rate of exchange. 802 S.W.2d at 803-04. If, however, the foreign currency

appreciates after the breach, then the judgment date sets the applicable rate of exchange.  *Id.*  The court reasoned that "these principles should be followed to ensure the only just result: placing the injured party in the position in which he would be had the loss not occurred."  *Id.* at 804.  The court concluded that since plaintiff "should not have to bear this loss as a result of [the defendant's] delay in payment," the rate of currency exchange at the time of the breach should have been used.  *Id.* at 804.

21.     In reaching its decision, the Texas court reviewed the two approaches that have emerged in cases interpreting federal statutory law.  Under the first approach, "the judgment day rule applies when the contract is payable in a foreign country in that country's currency; the breach day rule applies when the payment is to be made in the United States.  Under the second approach, the judgment day rule applies if the obligation arises entirely under foreign law; the breach day applies if the plaintiff could recover under United States law at the time of breach."  *Id.* at 802 (citing *In re Good Hope Chemical Corporation*, 747 F.2d 806, 811 (1st Cir. 1984), *cert. denied*, 471 U.S. 1102 (1985)).

22.     Groenke argues that the Fifth Circuit's decision in *Sembawang Shipyard, Ltd. v. Charger, Inc.*, 955 F.2d 983, 990 (5th Cir. 1992), which applied the judgment day rule, controls the court's conclusion here.  *See* Groenke's Proposed Findings of Fact ¶ 66 n.15.  However, the *Sembawang Shipyard* case involved a federal question,

not a federal court sitting in diversity over a question of Texas substantive law.  See

*Sembawang Shipyard, Ltd. v. M/V Charger, Inc.*, No. 88-CV-5005, 1990 WL 179782, at

*1 (E.D. La. Nov. 13, 1990).  Therefore it is not applicable here, and this court has a

duty to follow Texas substantive law under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64,

78 (1938).

23.     Here, because this is a diversity case, the court applies state law to

determine the conversion date.  *Phoenician Imports*, 802 S.W.2d at 803-05.  Further,

the court concludes that there has been a significant decline in the euro's value since

the date of Groenke's breach.  BKE's Supplement in Support of its Request for

Judicial Notice (docket entry 143) (as of December 31, 2012, the exchange rate was

.7590 euros per dollar (day of breach for 19 of 20 restaurants), and as of June 2015

trial in this action the exchange rate was 0.8950 euros per dollar).  Therefore, the

court converts the damages from euros to dollars using the exchange rate as of the day

of breach.  *Id.* at 2 (as of December 31, 2012, the exchange rate was .7590 euros per

dollar, and as of April 1, was 0.7800 per dollar).  This court takes judicial notice of

the exchange rate between the euro and the dollar on the day of breach.  *Ruiz*, 2007

WL 2978332, at *2 n.13.  Of the €478.217,37 sought by BKE, €470.841,59 were

past due as of December 1, 2012 and €7.375,78 became due as of April 1, 2013.

When the appropriate exchange rates are applied, Groenke owes BKE a total of

$629,800.77.9, or rounding down $629,800.77.

## IV.  CONCLUSION

For the reasons stated above, the plaintiff is entitled to judgment in its favor.


November 5, 2015.


_A. Joe Fish_

**A. JOE FISH**
**Senior United States District Judge**